# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ANDRE CRAWFORD-BRUNT, | ) | |
| Plaintiff, | ) ) | Civil Action No. |
| v. | ) ) | 17-11432-FDS |
| PETER KRUSKALL, | ) ) ) | |
| Defendant. | ) ) | |

### MEMORANDUM AND ORDER ON DEFENDANT'S MOTION TO DISMISS

SAYLOR, J.

  This is an action for fraud. Plaintiff Andre Crawford-Brunt alleges that he purchased 2% of the outstanding shares of Kensho Technologies, calculated on a fully diluted basis, from defendant Peter Kruskall and non-party Daniel Nadler, the two founders of Kensho. He alleges that he paid each of them $1 million for 220,000 shares of the company, but that he was not told about outstanding convertible promissory notes that could significantly dilute his ownership share. Taking those notes into account, Crawford-Brunt alleges that he was owed 86,739 additional shares from each co-founder. Nadler has since transferred that number of shares to Crawford-Brunt, but Kruskall has not. Crawford-Brunt filed this action against Kruskall seeking damages and equitable relief.

  Kruskall filed a motion to dismiss the complaint for failure to state a claim, on the ground that Kruskall himself did not participate in the negotiations with Crawford-Brunt and therefore could not have made a fraudulent misrepresentation. Because the complaint adequately alleges that Nadler was acting as an agent for Kruskall and that Kruskall knew of the misrepresentation

and remained silent, the motion to dismiss will be denied.

I. **Background**

   A. **Factual Background**

The following facts are set forth as alleged in the complaint.

Daniel Nadler and Peter Kruskall are the two co-founders of Kensho Technologies Inc. (Compl. ¶ 7). Nadler is the CEO of Kensho. (*Id.* ¶ 8). At the time Crawford-Brunt invested in the company, Kruskall was the Treasurer of Kensho. (*Id.* ¶ 9). Although he remains a shareholder, he is no longer an officer, director, or employee of the company. (*Id.* ¶ 10).

Crawford-Brunt first contacted Nadler on July 14, 2014, about the possibility of investing in Kensho. (*Id.* ¶ 11). In a telephone conversation, Nadler and Crawford-Brunt discussed Kensho's business extensively and the possible terms of Crawford-Brunt's investment. (*Id.* ¶¶ 11-12). Crawford-Brunt expressed interest in buying 2% of the outstanding shares of Kensho, calculated on a fully diluted basis. (*Id.* ¶ 12). According to the complaint, Nadler mentioned a similar investment that an executive of LinkedIn had made, and represented that he and Kruskall could offer those terms to Crawford-Brunt. (*Id.*). Nadler stated, and Crawford-Brunt believed, that Nadler was authorized to negotiate on behalf of Kruskall. (*Id.* ¶¶ 11-12, 14-15). In an e-mail to Nadler later that day, Crawford-Brunt wrote: "Please advise re the stake when you can. I would be happy to buy up a few million dollars." (*Id.* ¶ 13).

On July 17, 2014, Nadler responded:

> Andre, please see attached the doc for the transaction with the LinkedIn executive. He negotiated a 33% discount for the common stock relative to Goldman Sachs' 150M valuation for their investment in Kensho. We will pin down the exact amount we can carve out for you over the next few days, but what you suggest, a couple of million, is likely in range.

(*Id.* ¶ 14). Crawford-Brunt alleges that, by "we," Nadler was referring to himself and Kruskall. (*Id.* ¶ 15). A 33% discount from a $150 million valuation is a $100 million valuation. (*Id.* ¶ 16).

2

That e-mail attached a draft common-stock-purchase agreement, based on the agreement between the LinkedIn executive and sellers Nadler and Kruskall. (*Id.*). It left the amount of shares and the per-share price blank and stated: "**[NTD: Amounts to be $_____ worth of shares for each Seller at $100M valuation.]**" (*Id.*) Crawford-Brunt signed that agreement on July 25, 2014, and returned it to Nadler. (*Id.* ¶ 16, Ex. 2).

On September 11, 2014, Nadler told Crawford-Brunt that his and Kruskall's attorney would handle the closing of the transaction. (*Id.* ¶ 17). On September 12, that attorney sent Crawford-Brunt an e-mail that included a revised draft of the stock-purchase agreement, a redline of the agreement showing the changes from the previous draft, and a spreadsheet showing the share and price calculation. (*Id.* ¶¶ 17-18) The attorney described the changes as "non-substantive," apart from riders obligating Crawford-Brunt to abide by the restricted-stock agreements previously signed by Kruskall and Nadler. (*Id.* ¶ 17).

The redlined agreement struck "**[NTD: Amounts to be $_____ worth of shares for each Seller at $100M valuation]**" and added a statement in that Nadler and Kruskall would each sell 220,000 shares of Kensho stock to Crawford-Brunt at $4.5455 per share. (*Id.* ¶ 18, Ex. 2). The attached spreadsheet showed that Nadler and Kruskall each held 9,500,000 shares, the LinkedIn executive held 296,876 shares, employees held 2,162,085 shares, and that 541,039 shares were set aside as allocated or unallocated options, for a total of 22,000,000 shares. (*Id.* Ex. B). It stated that the "Valuation" is "$100,000,000"; the "Price Per Share" is "$4.5455"; the "Shares Purchased" are "220,000"; and the "Actual Purchase Price" is "$1,000,010.00." (*Id.*).[1]

Nadler and Kruskall were copied on the September 12 e-mail. (*Id.* ¶ 17, Ex. 2). "At no

---

[1] The complaint alleges that Crawford-Brunt paid Nadler and Kruskall $1 million each, not $1,000,010 each. (*Id.* ¶ 20). The discrepancy appears to be the result of a rounding error, as the exact calculated price per share would be $100,000,000 / 220,000,000 = 4.5\overline{4}$.

time did Kruskall indicate to [Crawford-Brunt], in response to this communication or otherwise, that Nadler had negotiated the terms of the transaction without Kruskall's knowledge and authorization." (*Id.*).

Around September 18, the agreement was executed by Crawford-Brunt, Nadler, and Kruskall. (*Id.* ¶ 20, Ex. 3). Crawford-Brunt wired $1 million each to Nadler and Kruskall, and Nadler and Kruskall each transferred 220,000 shares of Kensho to Crawford-Brunt. (*Id.* ¶ 20).

In early February 2015, Crawford-Brunt discovered that there were outstanding convertible promissory notes that, when converted, would dilute his ownership share significantly below 2%. (*Id.* ¶¶ 21, 25). The complaint alleges that if he had known about those notes, he would have negotiated for a larger number of shares in order to obtain the 2% of Kensho he had been promised. (*Id.* ¶ 22). Specifically, the complaint alleges that Crawford-Brunt should have received 173,478 more shares for his investment than he did. (*Id.* ¶ 24). Crawford-Brunt asked Nadler and Kruskall for 86,739 shares each to remedy the alleged fraud soon after his discovery. (*Id.* ¶ 25). Nadler turned over the shares; Kruskall did not. (*Id.*).

The complaint alleges that "[b]oth Kruskall and Nadler knew that [Crawford-Brunt] believed he was acquiring, in consideration for his investment, 2% of the outstanding shares of Kensho calculated on a fully diluted basis, but they did not disclose to [Crawford-Brunt] that his understanding was incorrect." (*Id.* ¶ 23). It further alleges that Nadler was Kruskall's agent for the purposes of the transaction at issue. (*Id.* ¶ 31).

### B. Procedural Background

Crawford-Brunt filed the complaint in this action on August 3, 2017. Count 1 alleges fraud and seeks damages in excess of $300,000. (*Id.* ¶ 33). Count 2 seeks reformation based on unilateral mistake and a transfer of 86,739 additional shares to plaintiff. (*Id.* ¶ 39).

Kruskall has moved to dismiss the complaint for failure to state a claim.

4

## II.  Standard of Review

On a motion to dismiss, the court "must assume the truth of all well-plead[ed] facts and give . . . plaintiff the benefit of all reasonable inferences therefrom." *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 5 (1st Cir. 2007) (citing *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999)).  To survive a motion to dismiss, the complaint must state a claim that is plausible on its face.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  That is, "[f]actual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Id.* at 555 (citations and footnote omitted).  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 556).  Dismissal is appropriate if the facts as alleged do not "possess enough heft to sho[w] that [plaintiff is] entitled to relief."  *Ruiz Rivera v. Pfizer Pharm., LLC*, 521 F.3d 76, 84 (1st Cir.2008) (alterations in original) (quoting *Clark v. Boscher*, 514 F.3d 107, 112 (1st Cir. 2008)) (internal quotation marks omitted).

Ordinarily, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2).  For that reason, "[g]reat specificity is ordinarily not required to survive a Rule 12(b)(6) motion."  *Garita Hotel Ltd. P'ship v. Ponce Fed. Bank, F.S.B.*, 958 F.2d 15, 17 (1st Cir. 1992).  However, under Fed. R. Civ. P. 9(b), in cases "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."  The basic purposes of that requirement are (1) to give the defendants notice and enable them to prepare a meaningful response; (2) to preclude the use of a groundless fraud claim as a pretext for using discovery as a fishing expedition; and (3) to safeguard defendants from frivolous charges that might damage their reputations.  *See In re Lupron Mktg. & Sales Practices Litig.*, 295 F. Supp. 2d 148, 170 (D. Mass. 2003) (quoting *New*

5

*England Data Servs., Inc. v. Becher*, 829 F.2d 286, 288 (1st Cir. 1987)). Under the heightened pleading requirement of Rule 9(b), a complaint alleging fraud must state the time, place, and content of the alleged false or fraudulent representations. *Epstein v. C.R. Bard, Inc.*, 460 F.3d 183, 189-90 (1st Cir. 2006). However, "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), as long as the complaint "*also* sets forth specific facts that make it reasonable to believe that defendant knew that a statement was materially false or misleading," *Greenstone v. Cambex Corp.*, 975 F.2d 22, 25 (1st Cir. 1992).

## III. Analysis

### A. Count 1: Fraud

The agreement provides, and the parties agree, that Delaware law governs this dispute. (Compl. Ex. 3 ¶ 8). Under Delaware law, a plaintiff seeking to establish fraud must prove by a preponderance of the evidence that: "(1) the defendant made a false representation; (2) the defendant knew the representation was untrue or made the statement with reckless indifference to the truth; (3) the defendant intended for the plaintiff to rely on the representation; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered causally related damages." *Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 807 (Del. Ch. 2014). "In addition to arising from overt misrepresentations, fraud also may occur through deliberate concealment of material facts, or by silence in the face of a duty to speak." *Id.*

Defendant argues that he cannot be liable for fraud because he had no communications with plaintiff and therefore could not have made any fraudulent statements. As set forth below, however, the complaint adequately pleads that Nadler was defendant's agent for the purposes of this transaction and that defendant knew of the alleged misrepresentations and remained silent.

6

### 1. **<u>Agency</u>**

Among other ways, an individual can become an agent of a principal if he or she acts with "actual authority" or "apparent authority." "An agent acts with actual authority when, at the time of taking action that has legal consequences for the principal, the agent reasonably believes, in accordance with the principal's manifestations to the agent, that the principal wishes the agent so to act." Restatement (Third) of Agency § 2.01 (2006); *see Harmon v. State*, 2010 WL 8250827, at *2 (Del. Super. Ct. Dec. 21, 2010) (using the Restatement (Third)'s definition of actual authority). "Apparent authority . . . 'is the power held by an agent or other actor to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations.'" *Vichi*, 85 A.3d at 799 (quoting Restatement (Third) of Agency § 2.03 (2006)). "In other words, 'apparent authority is such power as a principal holds his [a]gent out as possessing or permits him to exercise under such circumstances as to preclude a denial of its existence." *Id.* (alteration in original) (quoting *Pevar Co. v. Hawthorne*, 2010 WL 1367755, at *4 (Del. Super. Ct. Mar. 31, 2010)).

The complaint here plausibly alleges that Nadler was acting as Kruskall's agent. It alleges that Kruskall and Nadler were co-founders of the company; that Nadler stated that he had authority to act on behalf of Kruskall; that Kruskall expressed no surprise when copied on an e-mail containing a draft common-stock-purchase agreement proposing to obligate him to transfer shares to plaintiff; and that Kruskall ultimately signed that agreement. From those facts, it is plausible to infer that Kruskall had made manifestations to Nadler that Nadler was authorized to act on his behalf with regard to this transaction—in other words, that Nadler had actual authority to act on his behalf. Indeed, plaintiff could not be expected at this stage in the litigation to be able to allege with specificity what manifestations Kruskall might have made to Nadler.

Even if the allegations were not sufficient to create a reasonable inference that Nadler had actual authority, those same facts—excepting Nadler's statement that he had such authority, which is not a manifestation from Kruskall—suffice to plausibly allege that Nadler had apparent authority to act on behalf of Kruskall. It is a plausible allegation that plaintiff believed, based on Kruskall's status as a co-founder and his silence concerning and acceptance of an agreement negotiated by Nadler, that Nadler had authority to negotiate that agreement for him.

"A representation by an agent made incident to a contract or conveyance is attributed to a disclosed or undisclosed principal as if the principal made the representation directly when the agent had actual or apparent authority to make the contract or conveyance unless the third party knew or had reason to know that the representation was untrue or that the agent acted without actual authority in making it." Restatement (Third) of Agency § 6.11(2) (2006); *see Vichi*, 85 A.3d at 798-99 ("A principal is liable for the fraud of an agent even though the fraud was committed without the knowledge, consent or participation of the principal if the act was done in the course of the agent's employment and within the apparent scope of the agent's authority." (quoting *In re Brandywine Volkswagen, Ltd.*, 306 A.2d 24, 27 (Del. Super. Ct. 1973)). Because plaintiff alleges that he had no reason to believe that the shares would not be calculated on a fully diluted basis or that Nadler was acting without authority, the plausible allegations of an agency relationship appear to be sufficient to state a claim for fraud against Kruskall.

### 2. **Knowledge**

Furthermore, the complaint alleges facts from which a reasonable inference can be drawn that Kruskall knew of the alleged misrepresentation and remained silent. The allegation that Kruskall was copied on the September 12 e-mail suffices as an allegation that he knew that plaintiff intended to invest $2 million in Kensho based on a $100 million valuation. The attached redlined agreement shows that the number of shares sold and the price per share were to

8

be calculated from the dollar amount invested by plaintiff and the agreed-on $100 million valuation of Kensho. The spreadsheet indicates that plaintiff was purchasing 1% of the outstanding shares from each investor and prices the shares based on the $100 million valuation. More generally, Kruskall and Nadler were co-founders of a new company that—according to the capitalization table—had only one other stockholder apart from Kruskall, Nadler, and employees. It is thus a plausible inference that they talked to each other about the terms of the potential financing agreement with plaintiff. Additionally, Kruskall was the Treasurer of Kensho, from which it is more than plausible to infer that he knew of the sources of Kensho's capital, including the convertible promissory notes.

Kruskall argues that this is inadequate in light of the heightened pleading standard of Rule 9(b). But that rule only requires plaintiff to plead the "time, place, and content of the alleged false or fraudulent representations" with particularity. *Epstein*, 460 F.3d at 189-90. It does not require plaintiff to plead knowledge with heightened particularity; rather "knowledge . . . may be alleged generally." Fed. R. Civ. P. 9(b). The complaint here specifically alleges the time (July and September 2014), place (telephone and e-mail communications), and content (that plaintiff was purchasing 2% of Kensho's shares on a fully diluted basis) of the alleged misrepresentations, and alleges facts from which the inference can be plausibly drawn infer that Kruskall knew of the misrepresentation and remained silent. Therefore, the complaint adequately pleads a claim of fraud under Rule 9(b).

### 3. Reasonable Reliance

Finally, Kruskall argues that an experienced, prudent investor like plaintiff could not have reasonably relied on representations about the ownership of Kensho that did not include the convertible promissory notes held by Goldman Sachs, because plaintiff knew that he was getting a "33% discount for the common stock relative to Goldman Sachs' 150M valuation for their

9

investment in Kensho." (*See* Compl. ¶ 14, Ex. 1). The Court is not prepared to say on this record what it was reasonable or unreasonable for plaintiff to believe in that regard. The complaint alleges that plaintiff specifically told Nadler that he was interested in purchasing 2% of the outstanding shares of Kensho, calculated on a fully diluted basis; that he was presented with a capitalization table that purported to calculate the number of shares he was to purchase in accordance with his interest in acquiring 2% of the company; and that he would have acted differently if he had known of the existence of the convertible notes. The fact that Goldman Sachs had valued the company at $150 million does not necessarily mean that it held convertible promissory notes, that it had purchased stock in the company, or even that any completed transaction between it and Kensho had taken place. Therefore, the Court will not dismiss the fraud claim on the grounds of unjustified reliance on the capitalization table as a complete description of the ownership of Kensho at this stage. *See TrueBlue, Inc. v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *7 (Del. Super. Ct. Sept. 25, 2015) (explaining that whether a party's reliance was reasonable is a question of fact "not generally suitable for resolution on a motion to dismiss").

### B. Count 2: Reformation Based on Unilateral Mistake

Under Delaware law, in order to sustain an action for reformation based on unilateral mistake, a plaintiff must show that he "'was mistaken and that the other party knew of the mistake but remained silent.' The plaintiff must also show that the parties had come to a definite agreement that differed materially from the written agreement." *Great-West Inv'rs LP v. Thomas H. Lee Partners, L.P.*, 2011 WL 284992, at *11 (Del. Ch. Jan. 14, 2011) (quoting *Cerberus Int'l Ltd. V. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151-52 (Del. 2002)).

As discussed above, plaintiff has plausibly alleged that Kruskall knew of the mistake and remained silent. The complaint alleges that the parties had come to a definite agreement that

plaintiff would receive 2% of Kensho's outstanding stock, calculated on a fully diluted basis. It is undisputed that that agreement differs materially from the written agreement that was performed. Therefore, Count 2 will not be dismissed.

## IV.  Conclusion

For the foregoing reasons, defendant's motion to dismiss is DENIED.

**So Ordered.**

                                                /s/  F. Dennis Saylor
                                                F. Dennis Saylor, IV
Dated:  January 11, 2018                       United States District Judge