# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

ANDRE CRAWFORD-BRUNT,         )
                                )
    **Plaintiff,**              )
                                )     **Civil Action No.**
    **v.**                 )     **17-11432-FDS**
                                )
PETER KRUSKALL,           )
                                )
    **Defendant.**          )
_____)

## MEMORANDUM AND ORDER ON DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

**SAYLOR, J.**

This dispute involves a claim of fraud arising out of a sale of shares in Kensho Technologies, Inc., an analytics and machine learning company. Jurisdiction is based on diversity of citizenship.

Daniel Nadler and defendant Peter Kruskall founded Kensho in 2013. In mid-2014, plaintiff Andre Crawford-Brunt, who was then the global head of equity trading at Deutsche Bank, agreed to purchase 2% of Kensho's "fully diluted" shares for $2 million. Crawford-Brunt asked Nadler what the total number of "fully diluted" shares was, and Nadler replied by e-mail that there were approximately 21.5 million shares outstanding "as of now." Crawford-Brunt then acquired 220,000 shares apiece from Nadler and Kruskall.

Several months later, Crawford-Brunt learned that Kensho had previously issued to other investors convertible debt and other instruments that, if converted into stock, would have significantly diluted his stake in the company. He brought suit against Kruskall, alleging fraud

and seeking reformation of the purchase agreement based on unilateral mistake.

Kruskall has moved for summary judgment. For the following reasons, the motion will be denied.

## I.  Background

### A.  Factual Background

The following facts are as set forth in the record and are presented in the light most favorable to Crawford-Brunt, the non-moving party.

Kensho Technologies, Inc., is a data analytics and machine intelligence company that is incorporated in Delaware and has its principal place of business in Massachusetts. (Am. Compl. ¶ 7). Daniel Nadler is the CEO, and Peter Kruskall was previously the Treasurer and a member of the Board of Directors. (*Id.* ¶¶ 8-9). Both Nadler and Kruskall are founders of the company. Although Kruskall remains a shareholder, he is no longer an officer, director, or employee.[1]

In 2014, Andre Crawford-Brunt was the global head of equity trading at Deutsche Bank, a major investment bank. (Crawford-Brunt ("ACB") Dep. at 15:20-22). He is a resident of the United Kingdom.

In mid-2014, Kensho made a presentation to Deutsche Bank executives at its U.S. headquarters in New York. (*Id.* at 4:20-24). Although Crawford-Brunt did not attend the meeting, he was alerted to the company by another high-ranking bank employee, Tom Patrick. (*Id.* at 5:5-7). Crawford-Brunt reached out to Kensho and asked the company to return to New York to make a presentation to him. (*Id.* at 5:8-13). The presentation occurred sometime in late June 2014, and was performed by Adam Broun, who was then Kensho's Chief Technology Officer. (*Id.* at 5:16-20; 7:7-9). Deutsche Bank ultimately decided not to invest in Kensho. (*Id.*

---

[1] Kruskall is a citizen of Massachusetts.

at 7:23-8:2). However, Crawford-Brunt became interested in personally investing in the

company. (*Id.* at 11:5-7).

Crawford-Brunt first met Nadler in early July 2014. (*Id.* at 18:10-17). Around that time,

they also exchanged e-mails and text messages. (*Id.* at 19:3-16). Crawford-Brunt did not ask

Nadler about Kensho or how the company's product worked, nor did he conduct any

independent research. (*Id.* at 21:10-12; 21:17-21).

On July 14, 2014, Crawford-Brunt e-mailed Nadler the following:

[M]any thanks for your time today. I have not been this excited about an
opportunity in a long time! I would welcome being a shareholder or assisting in
any way I can.

Please advise re the stake when you can. I would be happy to buy up to a few
million dollars [of stock].

(ACB Dep. Ex. 1). Nadler answered as follows on July 17, 2014:

Andre, please see attached the doc for [a similar] transaction with [a] LinkedIn
executive. He negotiated a 33% discount for the common stock relative to
Goldman Sachs' [$150 million] valuation for their investment in Kensho.

We will pin down the exact amount we can carve out for you over the next few
days, but what you suggest, a couple of million, is likely in range.

(*Id.*).

According to Crawford-Brunt, he would receive a 33% discount for any prospective

investment "because [he] was buying common shares from the founders, which . . . do not have

the same level of protection associated with preferred shares," which in turn "are paid dividends

before common shares." (ACB Decl. ¶ 9). Around that time, Nadler mentioned to Crawford-

Brunt that he was negotiating with Goldman Sachs on a possible investment at a $150 million

valuation for the company. (ACB Dep. at 36:15-21). However, Crawford-Brunt did not ask

whether Goldman Sachs had closed on an investment with Kensho. (*Id.* at 36:22-37:14).

Crawford-Brunt testified that sometime over the next few days, he asked Nadler "what the fully diluted number of shares in issue was." (*Id.* at 28:5-9). In an e-mail sent at 8:12 p.m. on July 23, 2014, Nadler responded, "[w]ill have my legal guys confirm exact number [of shares] because its always complicated with the combination of founder stock, [restricted stock awards], [incentive stock options], option pools, etc., but its between 21M and 22M shares." (ACB Dep. Ex. 2). Later that evening, at 9:17 p.m., Nadler e-mailed Crawford-Brunt that the number of shares outstanding "as of now" was 21,458,961. (*Id.*).

Crawford-Brunt testified that he and Nadler never discussed a definition for the term "fully diluted." (ACB Dep. at 29:12-14). However, he further testified that he defined the term as "the total number of shares based on . . . all instruments, outstanding instruments being diluted—being exercised at the time. So the maximum number of shares at issue." (*Id.* at 30:8-11).[2] He defined "instruments," in turn, to refer to financial instruments that have "equity or equity-like characteristics," including "options, warrants, [and] share option pool[s]." (*Id.* at 31:7-12). He further testified that an investor "would want to understand what [the] fully diluted share count would be so that [he] could calculate the right share price from it." (*Id.* at 30:11-15).

Crawford-Brunt testified that after July 23, 2014, he and Nadler orally agreed that he would "mak[e] an investment at a 33 percent discount to Goldman Sachs on a fully diluted share count of just under around 21 and a half million shares." (*Id.* at 39:23-40:2). On July 25, 2014, Crawford-Brunt's assistant, Mary Wynman, e-mailed Nadler a copy of a Common Stock Purchase Agreement signed by Crawford-Brunt. (ACB Dep. Ex. 3). The number of shares to be sold and the price per share were not stated in the draft document. (*Id.*). Over the next few

---

[2] The parties have provided competing expert reports on the meaning of "fully diluted" shares. (*See* Cohen Report; Duarte-Silva Report).

months, Crawford-Brunt did not do any further research into the company. (ACB Dep. at 51:4-15).

On September 11, 2014, Nadler advised Crawford-Brunt that Peter Osborn, an attorney at the firm WilmerHale, would facilitate the closing. (ACB Dep. Ex. 4). Osborn e-mailed Crawford-Brunt on September 12, 2014, stating that he had revised the Common Stock Purchase Agreement "to provide for a joinder to the restricted stock agreements that [Nadler] and [Kruskall] are bound by with the company." (ACB Dep. Ex. 5). The revisions specified that Nadler and Kruskall would each sell 220,000 shares at a price of $4.5455 per share to Crawford-Brunt. (*Id.*).

Osborn "also attached a spreadsheet showing the [price per] share and price calculation for [Crawford-Brunt's] reference." (*Id.*). The calculations in the spreadsheet were as follows:

| Shareholder | Number of Shares |
|---|---|
| Daniel Nadler | 9,500,000 |
| Peter Kruskall | 9,500,000 |
| Brandon Liu | 296,876 |
| Restricted Stock to Employees | 2,162,085 |
| Options - Allocated + Unallocated Pool | 541,039 |
| TOTAL | 22,000,000 |
| Valuation | $100,000,000 |
| Price Per Share | $4.5455 |
| Shares Purchased | 220,000 |
| Actual Purchase Price | $1,000,010.00 |

(*Id.*). The sale closed six days later, on September 18, 2014, when Crawford-Brunt, Nadler, and Kruskall all signed the revised Common Stock Purchase Agreement. (ACB Dep. Ex. 6).

In the fall of 2014, Goldman Sachs closed a transaction with Kensho. (ACB Dep. at

80:9-18). Crawford-Brunt initially assumed that was a good thing for his investment in Kensho,

because "Goldman Sachs is one of the preeminent investment banks in the world," and therefore

its investment was "a sign of faith in the product." (*Id.* at 81:3-6). Sometime after that, Kruskall

left Kensho, and Kensho acquired some of Kruskall's unvested shares. (*Id.* at 82:9-11).

On January 26, 2015, Crawford-Brunt e-mailed Michael Bain, an attorney at

WilmerHale, the following:

> So you have the picture. When I invested [I] was told [Goldman Sachs was] negotiating at [a $150 million] valuation. I acquired a 2% stake at [a $100 million] valuation from [Nadler] and [Kruskall] (which I assumed included any dilution effect from convertible debt).
>
> Just want to get comfortable with the process, the stake I acquired and any dilution post my purchase on May 2014.

(ACB Dep. Ex. 7).

However, after receiving information from Kensho's attorneys, Crawford-Brunt learned

that his stake was smaller than what he believed it was. (ACB Dep. at 82:13-16). Specifically,

he learned that at the time he executed the Common Stock Purchase Agreement, Kensho had

already sold convertible promissory notes to other investors. (Ewing Decl. Ex. H). Moreover,

he learned that Goldman Sachs specifically had been granted warrants, an option, and a

convertible note. (ACB Decl. ¶¶ 12-18, 25-33).[3] Crawford-Brunt testified that he was

previously unaware of those instruments, which if fully converted into equity would have

substantially diluted his 2% stake in the company. (ACB Dep. at 84:10-15, 86:2-8).

According to Crawford-Brunt, he "should have received an additional 98,309 Kensho

shares under the [Common Stock Purchase] Agreement from each of Nadler and Kruskall."

---

[3] Much of the information relevant to Goldman Sachs's investment in Kensho has been heavily redacted, and the parties have failed to file unredacted documents under seal. Accordingly, the Court's ability to understand the effect of the Goldman Sachs investment is significantly curtailed.

(ACB Decl. ¶ 30).

### B. Procedural Background

The complaint in this action was filed on August 3, 2017. It asserts two claims. Count One asserts a claim for common-law fraud, alleging that Kruskall (through Nadler) knowingly and intentionally failed to reveal the existence of convertible debt which would have diluted Crawford-Brunt's shares. (Am. Compl. ¶¶ 25-32). Count Two seeks reformation of the Common Stock Purchase Agreement with respect to Kruskall's shares on the basis of unilateral mistake. (*Id.* ¶¶ 33-38).[4] On January 11, 2018, the Court denied Kruskall's motion to dismiss for failure to state a claim.

On July 9, 2018, Kruskall filed a third-party complaint against WilmerHale, alleging breach of professional duty and negligent misrepresentation. It further alleged that WilmerHale had aided and abetted misrepresentations made by Nadler. Kruskall and WilmerHale entered into a settlement agreement on November 14, 2018, ending the firm's involvement in this suit. On February 11, 2019, the Court permitted Crawford-Brunt to amend his complaint to add new factual allegations. After completion of discovery, Kruskall moved for summary judgment.

## II. Standard of Review

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.,* 950 F.2d 816, 822 (1st Cir. 1991) (quoting *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir. 1990)). Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue is "one that must be decided at trial because the evidence,

---

[4] The claims against Nadler have been settled.

viewed in the light most flattering to the nonmovant, would permit a rational factfinder to resolve the issue in favor of either party." *Medina-Munoz v. R.J. Reynolds Tobacco Co.,* 896 F.2d 5, 8 (1st Cir. 1990) (citation omitted). In evaluating a summary judgment motion, the court indulges all reasonable inferences in favor of the nonmoving party. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir. 1993). When "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250 (1986) (quotations omitted). The nonmoving party may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

### III.  <u>Analysis</u>

As a preliminary matter, the parties dispute whether Massachusetts or Delaware law applies to this case. In litigating the motion to dismiss, the parties agreed that Delaware law governed this dispute, as provided for in the Common Stock Purchase Agreement. *See Crawford-Brunt v. Kruskall*, 2018 WL 379022, at *3 (D. Mass. Jan. 11, 2018). However, in his memorandum in support of his motion for summary judgment, Kruskall argues that Massachusetts law controls. Specifically, he cites to *NPS, LLC v. Ambac Assur. Corp.*, 706 F. Supp. 2d 162, 168 (D. Mass. 2010), which states that "[t]he First Circuit has held that claims about the validity of a contract's formation, unlike claims of an alleged breach, are not governed by a choice of law provision." (citing *Northeast Data Sys., Inc. v. McDonnell Douglas Computer Sys. Co.*, 986 F.2d 607, 611 (1st Cir. 1993)).

Because both of the claims here concern contract formation, the Court agrees that the choice-of-law provision does not control. *See Shimizu Corp. v. Dow Roofing Sys., LLC*, 2013 WL 5513035, at *7 (D. Mass. Sep. 27, 2013) ("Massachusetts choice-of-law rules dictate that a

contractual choice-of-law clause only governs tort claims when breach of the contract is an essential element of the alleged tort, which is not the case in this action."). In his opposition memorandum, Crawford-Brunt notes that the First Circuit has previously stated that "[w]hen opposing parties agree to the source of the substantive law that controls their rights and obligations, and no jurisdictional concerns are present, a court is at liberty to accept such an agreement without independent inquiry." *In re Newport Plaza Assocs., L.P.*, 985 F.2d 640, 644 (1st Cir. 1993). However, here "the opposing parties [no longer] agree as to the source of the substantive law." *Shimizu Corp.*, 2013 WL 5513035, at *10. In addition, "while a court *may* find waiver for failure to timely raise choice-of-law issues or when opposing parties agree to the source of the substantive law, courts are not *required* to find such waiver." *Id.* (emphases in original). Therefore, the parties' earlier agreement does not preclude a finding that Massachusetts law controls the disposition of this motion.

In any event, the "initial task of a choice-of-law analysis is to determine whether there is an actual conflict between the substantive law of the interested jurisdictions." *Levin v. Dalva Bros., Inc.*, 459 F.3d 68, 73 (1st Cir. 2006). The elements of common-law fraud are substantively identical under the laws of Delaware and Massachusetts. *Compare Stolzoff v. Waste Sys. Int'l Inc.*, 58 Mass. App. Ct. 747, 759 (2003), *with Vichi v. Koninklijke Philips Elecs., N.V.*, 85 A.3d 725, 807 (Del. Ch. 2014). The elements necessary for a contract reformation claim based on unilateral mistake are also substantively identical. *Compare Polaroid Corp. v. Travelers Indem. Co.*, 414 Mass. 747, 756 (1993), *with Cerberus Int'l, Ltd. v. Apollo Mgmt., L.P.*, 794 A.2d 1141, 1151-52 (Del. 2002). Because there are no substantive differences, the Court need not proceed any further in the choice-of-law analysis.

## A.  Fraud

"In order to establish a claim of fraud, a plaintiff must show 'that the defendant [1] made a false representation of a material fact [2] with knowledge of its falsity [3] for the purpose of inducing the plaintiff to act thereon, and [4] that the plaintiff [reasonably] relied upon the representation as true and [5] acted upon it to his damage.'"  *Stolzoff*, 58 Mass. App. Ct. at 759 (quoting *Danca v. Taunton Sav. Bank*, 385 Mass. 1, 8 (1982)); *see also Kenda Corp., Inc. v. Pot O'Gold Money Leagues, Inc.*, 329 F.3d 216, 225 (1st Cir. 2003).[5]  Kruskall argues that summary judgment is warranted on Count One because Crawford-Brunt cannot prove the existence of either the first or fourth elements.

### 1.  False Statement of Material Fact

First, Kruskall contends that Nadler never made a false statement of a material fact in his July 23 e-mails, which (according to Crawford-Brunt) stated the number of Kensho shares on a fully diluted basis.  (Mem. in Supp. at 4-7).  Specifically, Kruskall notes that Crawford-Brunt testified that he had asked Nadler for "the fully diluted number of shares in issue."  (ACB Dep. at 28:11-12).  He further argues that in the English legal system, the phrase "shares in issue" refers to "issued and outstanding shares," not fully diluted shares, and therefore Crawford-Brunt was at fault for asking an ambiguous question.  (Mem. in Supp. at 5 (citing *Plessey Co. PLC v. Gen. Elec. Co. PLC*, 628 F. Supp. 477, 482 (D. Del. 1986)).  He thus contends that Nadler's representations that there were 21,458,961 shares outstanding "as of now" was correct.

---

[5] Delaware courts have similarly defined the elements of common-law fraud. *See Vichi*, 85 A.3d at 807 ("To prove a claim for fraud, a plaintiff must prove by a preponderance of the evidence that:  (1) the defendant made a false representation; (2) the defendant knew the representation was untrue or made the statement with reckless indifference to the truth; (3) the defendant intended for the plaintiff to rely on the representation; (4) the plaintiff justifiably relied on the representation; and (5) the plaintiff suffered causally related damages.").  Although Delaware law appears to further impose liability on a defendant who makes a false representation "with reckless indifference to the truth," Crawford-Brunt concedes that "it does not matter whether Delaware or Massachusetts law is applied to [the] common law fraud claim."  (Mem. in Opp. at 6 n.2).

In opposition, Crawford-Brunt first contends that Kruskall is barred from making that argument because in his third-party complaint against WilmerHale, he alleged that the firm had helped Nadler make misrepresentations about the total number of "fully diluted" shares. (Mem. in Opp. at 7-8; *see also* Am. Third-Party Compl. ¶¶ 13-16). Crawford-Brunt contends that those factual assertions "were not pleaded in the alternative" and are "judicial admissions by which [Kruskall] is bound throughout the course of this proceeding." (Mem. in Opp. at 8). To be sure, the third-party complaint is not a model of clarity—the only reference to facts being pleaded in the alternative is with respect to how WilmerHale attorneys purportedly breached their professional duties. (Am. Third-Party Compl. ¶¶ 17-19). However, Rule 8 provides that "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically" and that the party "may state as many separate claims or defenses as it has, regardless of consistency." Fed. R. Civ. P. 8(d)(2)&(3). Moreover, a party "need not use particular words to plead in the alternative as long as it can be reasonably inferred that this is what it was doing." *G-I Holdings, Inc. v. Baron & Budd*, 238 F. Supp. 2d 521, 536 (S.D.N.Y. 2002) (internal quotation marks, citation, and alteration omitted). Because it can be inferred that Kruskall intended the factual allegations in the third-party complaint to be operative only if he were found liable, those allegations will not be treated as judicial admissions.

Nevertheless, viewing the evidence in the light most favorable to the non-moving party, there is a disputed issue of material fact as to whether Nadler made a false representation. Crawford-Brunt testified that in the days leading up to the July 23 e-mails, he asked Nadler over the phone "what the fully diluted number of shares in issue was." (ACB Dep. at 28:8-9, 28:23-24). Then, in the first July 23 e-mail, Nadler responded, "[w]ill have my legal guys confirm [the] exact number [of shares] because its always complicated with the combination of . . .

[incentive stock options], option pools, etc." (ACB Dep. Ex. 2). Nadler further stated that "[t]he exact [percentage] conversion is always very complex." (*Id.*). The references to options and conversions support an inference that Nadler was aware that Crawford-Brunt was seeking the total number of shares on a fully diluted basis, not merely shares already in existence.

Kruskall's reliance on *Plessey*, 628 F. Supp. at 482, for the proposition that the phrase "shares in issue" means "issued and outstanding shares" is misplaced. Nowhere in *Plessey* did the district court make that finding—indeed, the only time "shares in issue" is mentioned is in a block quote from a press release. In addition, Crawford-Brunt testified that his usage of the term "in issue" was mistaken, as he was unfamiliar with that phrase. (ACB Dep. at 34:23-24). He later attested that he "used 'in issue' during [his] deposition as a synonym for 'in question.'" (ACB Decl. ¶ 21). To be sure, a reasonable factfinder could believe, as Kruskall argues, that Crawford-Brunt asked an ambiguous question and that Nadler only stated the number of Kensho shares actually issued at that time. However, that argument must be reserved for a jury at trial.

### 2. **Reasonable Reliance**

Kruskall further contends that Crawford-Brunt could not have reasonably relied on the July 23 e-mails as a representation of the maximum possible number of Kensho shares. (Mem. in Supp. at 7-18). Kruskall argues that Crawford-Brunt, an experienced equities trader, should have noticed that Nadler's statement that there were 21,458,961 shares outstanding "as of now" signaled that there were other investors who held "equity-like" instruments. (*Id.* at 8; ACB Dep. Ex. 2). However, as set forth above, a reasonable factfinder could infer from the record that Nadler's July 23 e-mails were representations of the fully diluted number of Kensho shares.

Kruskall also notes that Crawford-Brunt failed to conduct any due diligence into Kensho, including asking "before closing his purchase in September whether the [total number of shares]

had changed during the [past] seven weeks." (Mem. in Supp. at 10). In a similar vein, Kruskall has submitted several articles from reputable financial news websites discussing seed investments in Kensho by venture capital firms. (*See generally* Def. Ex. 2). Again, however, at summary judgment the Court must construe all evidence in the light most favorable to the non-moving party. As noted, there are statements from Kensho's CEO that purportedly identified the number of fully diluted shares. Moreover, Kensho's counsel at WilmerHale had sent a spreadsheet before closing identifying a total of 22 million shares, of which 541,039 were unallocated. And almost all the articles Kruskall highlights do not identify the form of investment made by the venture capital firms. Armed with that evidence, a reasonable factfinder could conclude, as Crawford-Brunt did, that there were no other investors with equity-like instruments that could dilute his stake. *See Kenda Corp.*, 329 F.3d at 227 (affirming jury verdict on fraudulent-inducement claim where sophisticated investor plaintiff relied on representations made by defendant despite lack of diligence).[6]

Finally, Kruskall contends that the Common Stock Purchase Agreement and spreadsheet provided by WilmerHale on September 12, 2014, lead to only one reasonable conclusion—that Crawford-Brunt was not purchasing fully diluted stock. (Mem. in Supp. at 18). He reasons that the "spreadsheet told [Crawford-Brunt] unambiguously that the [reported share count] did not include any investors' 'equity-like' rights, and thus did not present the full dilution analysis [Crawford-Brunt] sought." (*Id.* at 16). However, that is not the only possible reading of the spreadsheet, which listed quantities of both issued stock and unissued stock in the form of options (allocated and unallocated). This evidence, viewed in the context of Crawford-Brunt's

---

[6] Of course, nothing prevents defense counsel from cross-examining Crawford-Brunt on his lack of due diligence.

testimony that he had asked for the total number of diluted shares on multiple occasions, is consistent with his understanding of the terms of the agreement.

Of course, there is substantial evidence that Crawford-Brunt is a highly sophisticated investor who conducted virtually no due diligence and who ignored multiple warning signs as to the nature of his investment. Nonetheless, there is a genuine issue of disputed material fact as to whether his reliance on the alleged misrepresentation was reasonable, and the motion for summary judgment will therefore be denied as to Count One.

**B.** **Reformation Based On Unilateral Mistake**

In the case of unilateral mistake, a contract may seek reformation where the mistake is "known to the other party." *Polaroid Corp.*, 414 Mass. at 756 (citing *Mickelson v. Barnet*, 390 Mass. 786, 791 (1984)).[7] However, the party seeking reformation "must present full, clear, and decisive proof of mistake." *Id.* (citing *Mickelson*, 390 Mass. at 792). "If these conditions are met, a court may choose to reform the agreement at its discretion." *Nissan Autos. of Marlborough, Inc. v. Glick*, 62 Mass. App. Ct. 302, 306 (2004).

Kruskall offers two reasons for why summary judgment is appropriate as to the reformation claim. First, he contends that Crawford-Brunt was not justified in relying on Nadler's representation. As explained above, however, there are disputed issues of fact as to (1) whether Nadler made a material misrepresentation and (2) if so, whether Crawford-Brunt's reliance on the misrepresentation was reasonable.

Kruskall also argues Massachusetts requires the party invoking unilateral mistake must "not bear the risk of the mistake." (Mem. in Supp. at 19 (citing *Greene v. Ablon*, 794 F.3d 133,

---

[7] Similarly, in Delaware, a party seeking contract reformation "must show that it was mistaken and that the other party knew of the mistake but remained silent." *Cerberus Int'l*, 794 A.2d at 1151. Moreover, "[t]he plaintiff must show by clear and convincing evidence that the parties came to a specific prior understanding that differed materially from the written agreement." *Id.* at 1151-52.

147 (1st Cir. 2015)).  However, he misreads that section of *Greene*, which set forth the elements required for *voiding* a contract on the basis of unilateral mistake.  Here, Crawford-Brunt is only seeking reformation.  Therefore, that argument is inapposite, and the motion for summary judgment will be denied as to Count Two.

## IV.    <u>**Conclusion**</u>

For the foregoing reasons, defendant's motion for summary judgment is DENIED.

**So Ordered.**

<table>
<tr><td></td><td>/s/ F. Dennis Saylor IV</td></tr>
<tr><td></td><td>F. Dennis Saylor IV</td></tr>
<tr><td>Dated: June 12, 2019</td><td>United States District Judge</td></tr>
</table>