## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **ANDRE CRAWFORD-BRUNT,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **17-11432-FDS** |
| ) | |
| **PETER KRUSKALL,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION IN LIMINE SEEKING A DETERMINATION OF THE LEGAL STANDARD TO BE APPLIED TO THE ISSUE OF DAMAGES ON HIS COMMON-LAW FRAUD CLAIM

**SAYLOR, C.J.**

This dispute involves a claim of fraud arising out of a sale of shares in Kensho Technologies Inc., an analytics and machine learning company.  Jurisdiction is based on diversity of citizenship.

Daniel Nadler and defendant Peter Kruskall founded Kensho in 2013.  In mid-2014, plaintiff Andre Crawford-Brunt, who was then the global head of equity trading at Deutsche Bank, agreed to purchase 2% of Kensho's "fully diluted" shares for $2 million.  Crawford-Brunt asked Nadler what the total number of "fully diluted" shares was, and Nadler replied by e-mail that there were approximately 21.5 million shares outstanding "as of now."  Crawford-Brunt then acquired 220,000 shares apiece from Nadler and Kruskall.

Several months later, Crawford-Brunt learned that Kensho had previously issued to other investors convertible debt and other instruments that, if converted into stock, would have significantly diluted his stake in the company.  He brought suit against Kruskall, alleging fraud

and seeking reformation of the purchase agreement based on unilateral mistake.

Crawford-Brunt has moved *in limine* seeking a determination of the legal standard to be applied to the issue of damages on his common-law fraud claim.

## I.    <u>Background</u>

On September 18, 2014, Crawford-Brunt purchased 440,000 shares of Kensho—220,000 each from Kruskall and Nadler—for $2 million.  (Am. Compl. ¶ 19).  He alleges that he was led to believe he was purchasing 2% of Kensho's outstanding shares as calculated on a "fully diluted" basis.  (*Id.* ¶ 11).  He also alleges that he was told he was purchasing the shares based on a $100 million valuation of Kensho, which was a 33% discount relative to Goldman Sachs' valuation for its investment in the company.  (*Id.*).[1]

Around late January or early February 2015, Crawford-Brunt discovered what he alleges was "the existence of outstanding convertible promissory notes that, when converted or exercised, would significantly dilute the number of shares [he] had purchased and thereby diminish the value of [his] investment."  (Am. Compl. ¶¶ 20; *see also* Def. Opp., Ex. A).  Crawford-Brunt then asked both Nadler and Kruskall to transfer him additional shares, which Nadler did but Kruskall did not.  (Am. Compl. ¶ 24).

The complaint in this action was subsequently filed on August 3, 2017.  Count One asserts a claim for common-law fraud, alleging that Kruskall (through Nadler) knowingly and intentionally failed to reveal the existence of convertible debt which would have diluted Crawford-Brunt's shares.  (*Id.* ¶¶ 25-32).  Count Two seeks reformation of the Common Stock

---

[1] Crawford-Brunt also contends that he was defrauded as to the valuation, based on the amount of the discount relative to the Goldman Sachs valuation.  For present purposes, the Court will simply assume a $100 million valuation.

Purchase Agreement with respect to Kruskall's shares on the basis of unilateral mistake.  (*Id.* ¶¶ 33-38).

On January 11, 2018, the Court denied Kruskall's motion to dismiss for failure to state a claim.  Thereafter, the parties engaged in discovery.

On April 25, 2018, Crawford-Brunt provided Kruskall with his amended initial disclosures under Fed. R. Civ. P. 26.  (Pl. Opp. to Def. Mot. to Compel Initial Damages Disclosures and For Sanctions, April 27, 2018, Ex. B).  In that document, Crawford-Brunt valued his damages stemming from Kruskall's fraud to be "an amount ranging from $282,778 to $408,705."  (*Id.* at 5).  He noted, however, that "because discovery from Kensho [was] likely to affect [the damages] computations, the amounts set forth herein reflect only the best possible calculations" that he could provide "based on the information reasonably available to him."  (*Id.* at 6).

Also in April 2018, S&P Global Inc. acquired Kensho.  (Pl. Mot. at 4).  As part of the transaction, Crawford-Brunt became the owner of S&P shares.  Thereafter, Crawford-Brunt sold most of the S&P shares he received as part of the Kensho sale.  (*Id.*).  He sold those shares at an average price of $206.90 per share; his rebuttal expert witness calculates the implied price of a Kensho share after the S&P transaction to be $17.50 per share.  (*See* Rebuttal Expert Report of Tiago Duarte-Silva, Ph.D. at Ex. 4).

In August 2018, in response to Crawford-Brunt's initial set of discovery requests, Kruskall allegedly "produced documents revealing that, prior to the date of [Crawford-Brunt's] investment, Kensho had granted Goldman Sachs . . . warrants and option that, if exercised, would have had a substantial impact on the calculation of Kensho shares on a fully diluted basis."  (Pl. Reply at 7).  Crawford-Brunt contends that he was "not aware of the existence of the

warrants and option" until Kruskall's production of those documents.  (*Id.*).  Based on that

discovery, Crawford-Brunt served his second amended initial disclosures under Fed. R. Civ. P.

26 on November 21, 2018.  (Def. Opp., Ex. B).  In that document, Crawford-Brunt calculated his

damages to amount to $8,059,881.72.  (*Id.* at 5).

Crawford-Brunt has now moved *in limine* for a ruling on the appropriate measure of

damages.

## II.    <u>Analysis</u>

The complaint does not assert a claim for breach of contract.  Instead, it asserts a tort

claim for fraud (or intentional misrepresentation) and a claim for reformation of the contract

based on mistake.  The question presented here is the proper measure of damages on the tort

claim.  In simplified terms, there are two basic approaches that could be used to measure those

damages.

The first approach concerns the value of the shares actually purchased.  Plaintiff paid $1

million to defendant for 220,000 shares, which he understood to be 1% of the total shares on a

fully diluted basis.  That calculation was based upon a valuation of the company at $100 million

and a representation that there were 21.5 million shares outstanding.[2]  That amounts to a price of

$4.54 per share.  Plaintiff now contends that in fact 1% of the shares, on a fully diluted basis,

would be approximately 340,400 shares, based upon the existence of outstanding shares and

instruments such as warrants that could be converted to equity.  (Def. Opp., Ex. B at 15).[3]  Using

the same valuation of $100 million, the value of the shares he acquired was approximately $2.94

---

[2] While the arithmetic does not work perfectly, the Court will use the numbers supplied by plaintiff.

[3] The parties dispute the number of shares to which plaintiff would be entitled if he is successful in proving his claim.  For present purposes, and for clarity of analysis, the Court will simply assume that 340,400 is the correct number.

per share.  Under that approach, plaintiff's damages, roughly speaking, would be the difference between $4.54 per share (what he paid) and $2.94 per share (what the shares were worth on a fully diluted basis), multiplied by the number of shares he purchased (220,000).  Those damages, by that calculation, total approximately $352,000.

The second approach concerns the number of shares actually purchased.  Plaintiff received 220,000 shares, rather than the 340,400 or so that (he says) actually represented 1% of the shares of the company on a fully diluted basis.  He contends that he should have received approximately one and a half times as many shares for the same purchase price of $1 million, and that he lost the opportunity to profit from the sale of those 120,400 additional shares.[4]  The critical distinction is this:  if that approach is employed, plaintiff may be entitled to damages based on the expectation interest that would accompany the ownership of those shares.  In particular, he says he would be entitled to the lost profits that he otherwise would have made had he owned the additional shares and been able to sell them.

In simple terms, the first approach focuses on the *price*—whether plaintiff paid too much for his 220,000 shares—and the second approach focuses on the *number of shares*—whether plaintiff received too little for his $1 million.  The difference between the two damages calculations may be significant, running into the millions of dollars.  The basic question presented is whether Massachusetts law permits the second approach.

Unfortunately, the question is complicated by the fact that courts use somewhat confusing nomenclature—in particular, the term "benefit of the bargain"—when analyzing damages in fraud cases.  An award of "benefit of the bargain" damages is normally a contract

---

[4] It appears that plaintiff sold most but not all of his S&P shares after the Kensho sale; presumably, a similar analysis applies to lost-expectation damages resulting from an increase in the value of shares that were not sold.  (*See* Rebuttal Expert Report of Tiago Duarte-Silva, Ph.D. at Ex. 4).

remedy.  *See, e.g., E. River S.S. Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 870 (1986)

(noting that "the resulting loss due to repair costs, decreased value, and lost profits is essentially

the failure of the purchaser to receive the benefit of its bargain—traditionally the core concern of

contract law"); *VMark Software, Inc. v. EMC Corp.*, 37 Mass. App. Ct. 610, 611 n.2 (1994)

("The long-established general rule for breach of contract recovery in Massachusetts is that the

wronged party should receive the benefit of his bargain, i.e., be placed in the same position as if

the contract had been performed.").  Tort damages, by contrast, are typically referred to as

"compensatory" damages.  *See, e.g., E. River S.S. Corp.*, 476 U.S. at 873 n.9 (noting that "tort

damages generally compensate the plaintiff for loss and return him to the position he occupied

before the injury," and that "[t]ort damages are analogous to reliance damages").  Under normal

circumstances, the purpose of tort law is "to compensate for loss sustained and restore the

plaintiff to his former position, and not to give him the benefit of any contract he has made with

the defendant."  *Twin Fires Inv., LLC v. Morgan Stanley Dean Witter & Co.*, 445 Mass. 411, 426

(2005) (quoting Restatement (Second) of Torts § 549(2) cmt. g).

In the fraud context, however, the term "benefit of the bargain" is often used to refer to

one or more categories of recoverable damages.  *See, e.g., Chamberlayne Sch. v. Banker*, 30

Mass. App. Ct. 346, 355 (1991) (stating that benefit-of-the-bargain damages is an appropriate

measure of damages in deceit cases).  In particular, the term is used to describe both lost-value

damages (typically, the difference between the value of what the victim has received and the

price paid for it) and lost-expectation damages (damages sufficient to give the victim the benefit

of his contract with the tortfeasor).  *See, e.g., Twin Fires*, 445 Mass. at 425.

Here, the issue is whether plaintiff is limited to the recovery of only lost-value damages

(that is, the difference between the price of the shares as represented and their actual value), or

whether he can also recover lost-expectation damages (that is, lost profits from the sale of

additional shares that he says he was entitled to receive).

Section 549 of the Restatement (Second) of Torts generally permits the recovery of both

types of damages.  That section provides as follows:

> (1) The recipient of a fraudulent misrepresentation is entitled to recover as damages in an action of deceit against the maker the pecuniary loss to him of which the misrepresentation is a legal cause, including

>> (a) the difference between the value of what he has received in the transaction and its purchase price or other value given for it; and

>> (b) pecuniary loss suffered otherwise as a consequence of the recipient's reliance upon the misrepresentation.

> (2) The recipient of a fraudulent misrepresentation in a business transaction is also entitled to recover additional damages sufficient to give him the benefit of his contract with the maker, if these damages are proved with reasonable certainty.

Restatement (Second) of Torts § 549.

This matter involves an allegedly fraudulent misrepresentation in a business transaction

based upon a contract.  Accordingly, if § 549 applies, it appears that plaintiff could recover lost-

value damages under section (1)(a) (that is, the difference between the price he paid for the

shares and what they were worth on a fully diluted basis) and lost-expectation damages under

section (2) (including any profits he would have made on the additional shares, if he can prove

those damages with reasonable certainty).

The law of Massachusetts is not quite as clear as the Restatement.  The usual formulation

of the rule is that a plaintiff claiming intentional misrepresentation under Massachusetts law is

entitled to the "benefit of his bargain or 'the difference between the value of what he has

received and the actual value of what he would have received if the representations had been

true'"—that is, lost-value damages.  *GTE Prods. Corp. v. Broadway Elec. Supply Co.*, 42 Mass.

7

App. Ct. 293, 296 (1997) (quoting *Rice v. Price*, 340 Mass. 502, 507 (1960)); *see also Morse v. Hutchins*, 102 Mass. 439, 440 (1869); *Piper v. Childs*, 290 Mass. 560, 561-62 (1935).  However, Massachusetts courts have also cited § 549 of the Restatement approvingly.  *See, e.g.*, *Twin Fires*, 445 Mass. at 426; *GTE Prods. Corp.*, 42 Mass. App. Ct. at 296.  Furthermore, in *Goldman v. Mahony*, 354 Mass. 705 (1968), the Supreme Judicial Court approved a jury instruction stating that "plaintiffs are entitled to recover damages sufficient to give them the benefit of their contractual bargain, if such damages are reasonably proved," citing to what was then the tentative draft of § 549, including section 2.  *Id.* at 709, 709 n.4.  It therefore appears that Massachusetts courts would generally apply the provisions of § 549 in an appropriate case, including the provisions of section 2, which permits recovery of lost-expectation damages.  But Massachusetts courts have also limited "benefit of the bargain" damages in some instances, stating that the usual rule "may be modified or supplemented to prevent injustice."  *Rice*, 340 Mass. at 509.

The Massachusetts case with the most superficial similarity to the present case is *Twin Fires*.  There, the plaintiffs sought to benefit from the initial public offering of a technology company.  They had been led to believe that a brokerage firm would allocate shares of the company's stock to them on the morning of the IPO—which turned out to be false—and that they would be able to quickly sell those shares into the market for a profit.  On the misrepresentation count, the trial judge awarded reliance damages of $39,650 (based on expenditures the plaintiffs had made to prepare to purchase the shares) but declined to award benefit-of-the-bargain damages of $13 million (the amount of profit the plaintiffs would have earned on the sale had they been able to receive an allocation of shares).  *See Twin Fires*, 445 Mass. at 424.

On appeal, the SJC noted that "in cases of fraudulent or intentional misrepresentation, the usual rule, at least in appropriate cases, is that the injured party receives benefit of the bargain damages." *Id.* at 425 (citations omitted).  The court agreed with the trial judge, however, that such an award was "not appropriate in this case." *Id.*

> Our courts have consistently limited the award of benefit of the bargain damages to cases of intentional misrepresentation where the person who was the target of the misrepresentation has actually acquired something in a transaction that is of less value than he was led to believe it was worth when he bargained for it. . . .
>
> In this case, [the] misrepresentation did not lead the plaintiffs to purchase something that was worth less than represented.  [Plaintiffs] did not acquire anything, nor did [they] pay for anything [they] did not want.  [They] "lost" only the opportunity to make a considerable profit on securities [they] did not own. . . . Limiting recovery to reliance damages where the plaintiffs have suffered no loss of value in the subject of the transaction is consistent with the purpose of tort law "to compensate for loss sustained and to restore the plaintiff to his former position, and not to give him the benefit of any contract he has made with the defendant."

*Id.* at 425-26 (quoting Restatement of Torts (Second) § 549(2) cmt. g) (citations and footnote omitted).

The court went on to observe:

> [The brokerage] received nothing from the plaintiffs and was not unjustly enriched by any actions [the broker's] misrepresentations induced the plaintiffs to make.  Nor did [the broker's] misrepresentation affect the value of [the company's] shares. Where the plaintiffs have not lost the benefit of a bargain because of a misrepresentation and a defendant has not gained anything thereby, awarding benefit of the bargain damages would be more than is required reasonably to make the injured party whole; it would create a windfall.

*Id.* at 426 (citations and quotation omitted).

*Twin Fires* has certain factual similarities with the present case.  For example, plaintiff here contends that he was improperly denied an opportunity to purchase additional shares, and therefore to profit on shares that he never owned.  However, in contrast to *Twin Fires*, plaintiff here *does* claim that he acquired something that had less value than it was represented to have:

he spent $1 million to acquire a number of shares that he was led to believe represented 1% of the company, but that actually represented less than that. This is not, then, a case in which plaintiff lost only the opportunity to acquire something: he in fact acquired a number of shares of Kensho stock, but acquired fewer than he believed he was bargaining for. Perhaps more importantly, defendant *did* allegedly gain something from plaintiff—according to plaintiff, he retained more shares of Kensho stock than he was entitled to based on the $1 million purchase price. In other words, if plaintiff can prove that he was defrauded, it appears that he can also prove that defendant was unjustly enriched.

The exception to the normal rule identified in *Twin Fires* therefore does not appear to apply, and therefore this is an "appropriate case" in which to employ a "benefit of the bargain" (that is, a lost-expectation) measure of damages. Plaintiff contends that he should have received an additional 120,400 shares for his $1 million purchase price, and that if he had received them, he would have sold them for a profit. Thus, if he can prove that he was defrauded, he can be awarded those lost profits, if he can prove them with "reasonable certainty."[5] In other words, he would receive the "benefit of the bargain"—the lost profits he would have received for his investment under the terms of his agreement "if [defendant's] representations had been true." *GTE Prods. Corp.*, 42 Mass. App. Ct. at 296.[6]

The parties offer two additional contentions, both of which may be readily dismissed. First, defendant contends that any additional shares owed to plaintiff should be valued on the day of the original sale—in other words, at most plaintiff would be entitled to the value of 120,400

---

[5] Presumably, he will have to prove with reasonable certainty that he would have sold them at a particular time and for a particular price. *See Pollen v. Aware, Inc.*, 53 Mass. App. Ct. 823, 830-31 (2002) (noting that a plaintiff's stock options that he should have received, but did not, should be valued at the time that he attempted to exercise the options).

[6] Presumably, plaintiff can only be awarded the net amount, taking into account his basis (that is, what he paid for the shares) and possibly accounting for any capital gains or other tax.

additional shares at the fully diluted price of $2.94 per share (approximately $354,000).  That approach, however, would prevent plaintiff from receiving the full benefit of his bargain—that is, the opportunity to take advantage of any increase in the shares' value.  Under the circumstances—and assuming, of course, that the underlying fraud can be proved—the risk of any change in value properly should lie with the defendant.  *See David v. Belmont*, 291 Mass. 450, 453 (1935) ("The defendant, if he fraudulently induced the plaintiff to keep his stock, took the risk of all such changes in value.") (quoting *Fottler v. Moseley*, 185 Mass. 563, 566 (1904)).

Second, plaintiff contends that any additional shares to which he would have been entitled should be valued at the time he discovered the fraud.  But that effectively assumes that he would have sold the shares at the exact moment of discovery, which is an assumption that the Court cannot make.  Plaintiff must prove his damages with "reasonable certainty"; whatever level of proof that requires, surely it cannot be satisfied simply by an arbitrary assumption. Furthermore, the cases cited by plaintiff are not to the contrary; they hold only that when a defrauded victim pays an inflated market price for a stock based on the defendant's deception, and the stock subsequently loses value, the plaintiff's loss is measured as of the date the fraud is discovered.  *See, e.g.*, *Whiting v. Price*, 172 Mass. 240, 242 (1898); *Reisman v. KPMG Peat Marwick LLP*, 57 Mass. App. Ct. 100, 114 (2003).  That rule applies as a way of measuring damages where the value of something has declined (which, among other things, prevents a plaintiff from claiming higher damages based on a continuing decline in value after discovery of the fraud).

In short, plaintiff will be allowed to attempt to prove fraud damages according to Restatement (Second) of Torts § 549, including section 2.  Such damages may include any lost profits he would have made on any additional shares he would have obtained but for the

misrepresentation, if he can prove the underlying fraud and if he can prove those damages with reasonable certainty.

**III.**   **<u>Conclusion</u>**

Accordingly, and for the foregoing reasons, plaintiff's motion *in limine* is denied in part and granted in part.  The measure of damages on the claim for fraud or misrepresentation will be based on the provisions of the Restatement (Second) of Torts § 549, which reflects the law of Massachusetts under the circumstances presented here.

**So Ordered.**

/s/ F. Dennis Saylor IV
F. Dennis Saylor IV

Dated:  August 9, 2021                          Chief Judge, United States District Court